IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHEASTERN DIVISION

| | |
|---|---|
| Vicky Wicker, )| |
| ) | |
| Plaintiff, ) | |
| v. ) | |
| ) | Case No. 3:06-cv-05 |
| Jo Anne Barnhart, ) | |
| Commissioner of Social Security ) | |
| Administration, ) | |
| ) | |
| Defendant. ) | |

**REPORT AND RECOMMENDATION**

Before the court are Vicky Wicker's (hereinafter "Wicker," "plaintiff," or "claimant") Motion for Summary Judgment (Doc. #5), the Commissioner of Social Security's ("Commissioner") Motion for Summary Judgment (Doc. #7), and plaintiff's Motion for Sentence Four Remand (Doc. #9). For the reasons articulated in this memorandum, the court recommends that plaintiff's Motion for Sentence Four Remand (Doc. #9) be **GRANTED**.

*Procedural Background*

Wicker initiated this action under 42 U.S.C. § 405(g) seeking judicial review of the Commissioner's final decision, which denied her application for disability insurance benefits ("DIB"). Wicker filed her application for benefits in 2003 with a protective filing date. (Transcript [hereinafter "Tr."] at 78). In her application, Wicker alleges she became disabled on January 1, 2002 (Tr. at 50). At the administrative law hearing, Wicker amended her date of disability to October 20, 2003 (Tr. at 280). In a decision dated May 5, 2005, the Administrative Law Judge (ALJ) held Wicker was not disabled within the meaning of the Act. (Tr. at 14-22).

In his decision, the ALJ evaluated Wicker's claim according to the five-step sequential

1

analysis prescribed by the Social Security regulations.  See 20 C.F.R. § 416.920(a) (1997); (Tr. at 14-22).  The ALJ found Wicker has "severe myotonic dystrophy" and asthma  (Tr. at 21).  He found plaintiff's impairments, alone or in combination, did not meet or equal the requirements set forth in the Listing of Impairments.  (Tr. at 21).  He concluded Wicker's allegations regarding her symptoms and limitations were not entirely credible.  (Tr. at 21).  The ALJ also concluded that Wicker was unable to perform her past relevant work.  (Tr.  at 21).  At the final step, he found Wicker had the exertional capacity to perform sedentary work, with limitations.  (Tr. at 21).

The Appeals Council denied review of Wicker's claim, and ALJ's decision became the final decision of the Commissioner.  (Tr. at 5-8).  Wicker appealed the Commissioner's decision to this court.  Wicker moved for summary judgment in April 2006 (Doc. #5).  The Commissioner moved for summary judgment in May 2006 (Doc. #7).

Wicker filed a second application for benefits after the ALJ issued his May 5, 2005 unfavorable decision on her first application.  Thus, she filed her second application during the pendency of this appeal.  On April 29, 2006, after plaintiff had filed her summary judgment motion with this court, the Commissioner entered a "Notice of Award" stating Wicker became disabled on May 6, 2005– the day after the ALJ's unfavorable decision.  Notice of Award, Attachment to Plaintiff's Motion for Sentence Four Reversal and Remand (Doc. #9).  Plaintiff then moved for reversal and remand under Sentence Four (Doc. #9).  Plaintiff argues the court should reverse and remand the case for hearing to determine whether Wicker was disabled prior to May 6, 2005, rather than rule on the cross-motions for summary judgment.  Plaintiff asserts that defendant selected May 6, 2005 for the disability onset date because administrative procedures do not allow an earlier onset of disability date when a prior application is on appeal.

Defendant objects to the motion to remand and asserts that substantial evidence supports the ALJ's decision regarding the period of time from October 20, 2003 to May 5, 2005. Defendant states: "The Commissioner acknowledges that Plaintiff suffers from a progressive condition that may have deteriorated after the ALJ's decision in May 2005. Nevertheless, the evidence of record . . . substantially supports the ALJ's decision that for the period of October 20, 2003, through the date of his decision, that Plaintiff was not disabled." Memorandum in Support of Defendant's Objection to Plaintiff's Motion to Remand, at 2 (Doc. #15).

### *Factual Background*

Wicker was 42 years old at the time of the administrative hearing. (Tr. at 281). She has a high school education. (Tr. at 281). She has worked previously as a cook, cashier, pants presser, and assembler. (Tr. at 62, 81). Wicker claims asthma and the genetic disorder myotonic muscular dystrophy as a basis for disability. (Tr. at 61). At the time of the administrative hearing, Wicker had worked for nine years at Hardee's. (Tr. at 283). She previously worked in the kitchen, but she can no longer work in that environment due to her asthma. (Tr. at 283). In October 2003, she decreased her hours at Hardee's to around 23 hours a week, working at the counter taking orders. (Tr. at 280, 283). Based on her reduced hours at Hardee's, the ALJ determined Wicker's employment was not substantial gainful activity. Wicker currently wears ankle braces to support her lower extremities and uses a cane at all times, except while working at the counter. (Tr. at 284-86). Wicker testified she "can't" use her cane while working at Hardee's, apparently because she works in a small area. (Tr. at 284; 197).

Some general medical information about myotonic muscular dystrophy is provided as background. Medical sources state:

> Myotonic dystrophy . . . affects both men and women, causing generalized

> weakness first seen in the face, feet, and hands. It is accompanied by the inability to relax the affected muscles (myotonia). Symptoms may begin from birth through adulthood. It is the most common form of muscular dystrophy, affecting more than 30,000 people in the United States.

The Gale Encyclopedia of Medicine, Vol. 3, 2262 (Jacqueline L. Longe, Editor, 2002). The symptoms of this disorder are wide-ranging in presentation and severity[1]:

> Symptoms of Myotonic dystrophy include facial weakness and a slack jaw, drooping eyelids (ptosis), and muscle wasting in the forearms and calves. A person with this dystrophy has difficulty relaxing his grasp, especially if the object is cold. Myotonic dystrophy affects heart muscle, causing arrhythmias and heart block, and the muscles of the digestive system, leading to motility disorders and constipation. Other body systems are affected as well: Myotonic dystrophy may cause cataracts, retinal degeneration, low IQ, frontal balding, skin disorders, testicular atrophy, sleep apnea, and insulin resistance. An increased need or desire for sleep is common, as is diminished motivation. Severe disability affects most people with this type of dystrophy within 20 years of onset, although most do not require a wheelchair even late in life.

Id. The record reflects that Wicker manifests many of the symptoms described above, including muscle weakness, myotonia, sleep apnea, increased need for sleep, and diminished motivation.

## *Discussion*

The magistrate judge finds plaintiff's motion for remand is appropriate and recommends granting the motion. The magistrate judge therefore also recommends denial of both parties' motions for summary judgment. However, plaintiff's motion for remand, standing alone, does not does not present sufficient evidence to warrant remand. Although Wicker received a favorable decision on her second disability application, such decision does not demonstrate that

---

[1] According to the Merck Manual, "[s]ymptoms can occur at any age, and the range of clinical severity is broad. Myotonia is prominent in the hand muscles, and ptosis is common even in mild cases. In severe cases, marked peripheral muscular weakness occurs, often with cataracts, premature balding, hatchet facies, cardiac arrhythmias, testicular atrophy, and endocrine abnormalities (eg, diabetes mellitus). Mental retardation is common. Severely affected persons die by their early 50s." The Merck Manual of Diagnosis and Therapy 1501 (Mark H. Beers, M.D. & Robert Berkow, M.D. editors, 17th ed. 1999).

the ALJ erred in his disability analysis regarding the time from October 20, 2003 to May 5, 2005.  Accordingly, the magistrate judge's recommendation relies on the briefing of both parties' motions for summary judgment motions[2] and plaintiff's motion to remand under Sentence Four.

      The court notes the deferential standard of review applied to these cases.  The court must affirm the Commissioner's decision if substantial evidence appearing in the record as a whole supports the decision.  See Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir. 1989).  The Commissioner's decision is not subject to reversal simply because the reviewing court would have reached a different conclusion or because substantial evidence also exists which would support a contrary outcome.  Sultan v. Barnhardt, 368 F. 3d 857, 863 (8th Cir. 2004).  If after review the court is capable of drawing two inconsistent positions and one of those positions represents the Commissioner's findings, the decision must be affirmed.  Dixon v. Barnhardt, 353 F.3d 602, 605 (8th Cir. 2003).

      Wicker claimed asthma as a basis for disability and has been hospitalized in the past for respiratory problems.  Under the standard described above, the magistrate judge finds that the ALJ properly assessed the work-related limitations arising from Wicker's asthma.  At the time of the hearing, medication and avoidance of respiratory irritants appeared to control claimant's respiratory condition.  (Tr. at 283; 306-07).  Although the recommendation for remand does not rely on the ALJ's findings regarding claimant's asthma, the ALJ's opinion reveals a disturbing pattern of distorting the evidence.  For example, Wicker testified she was unable to tolerate using

---

[2] Wicker raises four issues in her motion for summary judgment.  She alleges the ALJ erred in his credibility determination; erred in finding her myotonic muscular dystrophy did not meet the listing of impairments; erred in his assessment of claimant's residual functional capacity (RFC); and misapplied the Polaski standard.  Brief in Support of Plaintiff's Motion for Summary Judgment, at 10-18.

a CPAP device to treat her sleep apnea. (Tr. at 294-95). Apparently, the air blowing in her face makes it more difficult for her to breathe. The medical records support her testimony that she could not tolerate the CPAP. (Tr. at 221, 225, 243). The ALJ dismisses such evidence by stating "she has rejected the use of a CPAP for sleep apnea." (Tr. at 19).

The ALJ also states that "it is not known why the claimant's asthma or breathing sensitivities precludes work in the kitchen environment at Hardee's but does not preclude the preparation of large meals in the kitchen environment at home." (Tr. at 19). Wicker testified she and her husband share the cooking duties equally. (Tr. at 294). Her husband Matthew Wicker testified she "does cook major meals," but stated she needs assistance with lifting and opening. (Tr. at 311). Neither testified that Wicker regularly cooks large or elaborate meals. In response to the ALJ's comments regarding Wicker's cooking activities, Matthew Wicker wrote a letter to the Appeals Council clarifying that Wicker cooks the main course of large meals two to three times a year, and she requires his assistance for several tasks.[3] (Tr. at 257-58).

As previously stated, the ALJ reached the fifth step of the sequential evaluation. After determining Wicker could not perform her past relevant work, the ALJ concluded:

> The claimant retains a residual function capacity for lifting up to 10 pounds frequently, 20 pounds occasionally. She can frequently sit and she can occasionally stand and walk in jobs where she can avoid climbing and

---

[3] His letter also provides a reasonable explanation of why Wicker can cook at home, but not at Hardee's:

> At home, we do not operate 4 deep-fat fryers at a time, 15-square-foot grill, and three large industrial ovens with numerous grease-producing items cooking all at one time. Hardee's serves hundreds of people a day. When Vicky worked in the kitchen, she had to clean her glasses at least four to five times in a 8-hour shift to be able to see because of the grease build-up on her glasses. There was a constant layer of grease on the floor and walls. When cooking at home, Vicky does not get involved with cooking hamburgers or deep-fat fryers or any other items that put grease into the air.

(Tr. at 263).

6

> concentrated exposure to fumes, odors, dusts, gases and poor ventilation. She can push and pull within the exertional range specified.

(Tr. at 21). The ALJ must determine a claimant's RFC on the basis of all relevant evidence; this determination is a medical question which must be supported by some medical evidence. Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). The court notes that the burden continues to lie with the claimant if the ALJ determines that the claimant is capable of performing past relevant work. See Tucker v. Heckler, 776 F.2d 793, 795 (8th Cir. 1985); McCoy v. Schweiker, 683 F.2d 1138, 1146-47 (8th Cir. 1982). Here, the ALJ determined that Wicker could not perform her past relevant work. Thus, the burden has shifted. Jackson v. Schweiker, 696 F.2d 630, 631 (8th Cir. 1983). According to the Eighth Circuit Court:

> This burden has two aspects. First, the Secretary must prove that the claimant has the residual functional capacity to perform other kinds of work. Residual functional capacity is defined as what the claimant can still do despite her limitations, 20 C.F.R. § 404.1545(a) (1983), and includes an assessment of physical abilities and mental and other impairments. 20 C.F.R. § 404.1545(b), (c), (d) (1983). The Secretary has the burden to establish the claimant's residual functional capacity by substantial evidence. Second, once the claimant's capabilities are established, the Secretary has the burden to demonstrate that there are jobs available in the national economy that can realistically be performed by someone with the claimant's qualifications and capabilities.

Warner v. Heckler, 722 F.2d 428, 431 (8th Cir. 1983) (internal case citations omitted).

The magistrate judge concludes that the ALJ's assessment of claimant's RFC is not supported by substantial evidence appearing in the record as a whole. Therefore, the ALJ erred in finding there are jobs available in the national economy that Wicker realistically retains the capacity to perform, given her impairments from myotonic muscular dystrophy. Wicker's supervisor at Hardee's made the following observation: "Vicky['s] work performance has deteriorated over the past year. She is unable to perform all of the task[s] she use[d] to do. She has lost strength in her arms and legs which makes it difficult for her to complete certain tasks."

7

(Tr. at 93). The supervisor also noted Wicker's performance has "declined quickly in the past time. She requires more assistance to perform job. She is unable to perform certain tasks because of her restrictions." (Tr. at 92).

At the time of the hearing, Wicker testified she was participating in vocational rehabilitation to learn computer skills and typing. (Tr. at 288). The ALJ questioned vocational expert (VE) Frank Samlaska regarding Wicker's abilities. The VE testified to the following hypothetical posed by the ALJ:

> [ALJ]: [A]ssume an individual the Claimant's age, education, and past relevant work experience. Assume an individual with all the impairments described at this hearing. Assume she has the limitations . . . [of] occasionally lifting or carrying 20 pounds, frequently 10 pounds, stand and/or walk at least two hours in an eight-hour workday. Sit about six hours in an eight-hour workday. Push and pull is unlimited. Under postural limitations, ladders, ropes, and scaffolds are never. It appears everything else is occasional. Fumes, odors, dust, gas, et cetera are to be avoided, avoid concentrated exposure, and I think that's all. . . . Would that allow performance of her past relevant work?
> . . . .
> [VE]: [T]hat basically [is] what we call sed light exertional requirement. Though the lifting is occasionally 20, the limits on sit/stand with six out of eight sitting puts it in the sedentary for postural. So, no, there'd be no past relevant work.
> [ALJ]: Are there other jobs that would fit within that hypothetical?

(Tr. at 318). In response to this question, the VE states that jobs of receptionist-type work, information clerk, and scheduling clerk all exist in significant number in North Dakota. (Tr. at 318-19). He states that "when she's been working with Division of Rehabilitation Services, those are the types of things that they're going to be looking for." (Tr. at 319).

At the hearing, the ALJ questioned the VE regarding the functional capacity assessment (FCA) performed at the request of Wicker's treating physician, neurologist Richard Bailly, M.D. The VE testified that the final pages of the FCA appeared to be missing. Thus, the VE did not have the conclusions section. (Tr. at 319; 326). The report also lacked information about

Wicker's ability to work eight-hours days. (Tr. at 320-21). The VE stated that "the summary page of this report, would be, could be critical in [sic] there's any deviation in the number of hours based on observation between day one and day two." (Tr. at 320).

Significantly, the magistrate judge notes that the record still does not appear to contain the entire FCA. Tr. at 152-54, 204-5). The VE frames his answers to the ALJ's hypothetical questions with the assumption that Wicker could sustain work activity for an eight-hour day. However, the record does not contain substantial evidence to support this assumption. Rather, the record contains numerous references to Wicker's significant need for sleep during the day and exhaustion following her four-hour shifts at Hardee's. The ALJ dismisses this evidence and concludes the need for daytime sleep could "just as easily be discretionary napping rather than a function of her breathing impairments and dystrophy." (Tr. at 19).

The court notes the ALJ accorded very little weight to the opinions of Wicker's treating physician, neurologist Richard Bailly, M.D., who managed Wicker's care at the Meritcare Muscular Dystrophy Association Clinic.[4] (Tr. at 194-98). The ALJ noted Wicker does not have frequent medical appointments with Dr. Bailly, or other physicians, and takes only over-the-

---

[4] Although remand is not recommended on this basis alone, the magistrate judge questions whether the ALJ gave proper weight to Wicker's treating physician's opinion:

> A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight. A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record. By contrast, '[t]he opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence.' Likewise, the testimony of a vocational expert who responds to a hypothetical based on such evidence is not substantial evidence upon which to base a denial of benefits.

Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted). The ALJ does not adequately articulate the reasons he discounted Dr. Bailly's opinion and accepted those of the consulting physicians.

counter pain medication: "Treatment has been conservative and routine for the claimant's several complaints. There are large blocks of time when she receives no medical examination or new treatment initiatives whatsoever for the conditions she portrays as disabling." (Tr. at 18). However, the magistrate judge notes that Wicker has a progressive, degenerative condition that appears to have no treatment options beyond symptom management. The care Wicker receives care at the Muscular Dystrophy Clinic appears primarily to assess the disease's progression and resulting symptoms. Pain does not seem to be claimant's overriding problem, and furthermore, claimant's husband asserts that stronger narcotic pain medication is contraindicated with her myotonia. (Tr. at 259).

Dr. Bailly recommended that Wicker undergo a work tolerance screening process, which she completed. A letter from Dr. Bailly states:

> The patient is currently attempting to work 25 hours per week, but even this amount of work is causing a great deal of difficulty with pain in her lower extremities. Ms. Wicker recently had a functional capacity assessment done. The recommendations following the assessment were that the patient be employed only in a sedentary occupation that involves the use of hands below shoulder level and without significant lifting activities. If Ms. Wicker is not currently in a job description fitting those criteria, she may require vocational rehabilitation in order to allow suitable employment.

(Tr. at 200). The ALJ "[gave] no weight to Dr. Bailly's vocational opinion." (Tr. at 20). However, he " [found] substantial support for the residual functional capacity that has been found . . . in the functional capacity evaluation that was completed under Dr. Bailly's direction." (Tr. at 20). The ALJ relies on the opinions of the consulting physicians and their analysis of Wicker's impairments to determine she has the ability to perform sedentary work. The consultants' RFC assessments consist of checklist review based on medical records, not a personal examination. (Tr. at 147-48, 186-93). Such paper reviews without an actual

examination are entitled to little weight in a disability evaluation.  Taylor v. Chater, 118 F.3d 1274, 1279 (8th Cir. 1997).  Furthermore, the magistrate judge cannot be certain that the consulting physicians had the entire FCA to review.  Such uncertainty provides further reason for determining that consulting physicians' RFC assessments are entitled to little weight.

Furthermore, the incomplete FCA does not substantially support the ALJ's conclusions regarding Wicker's RFC.  The portion of the FCA in the record indicates that Wicker has various significant defects, including decreased grip strength, decreased tolerance for overhead activities, decreased tolerance for stair climbing and step ladder, decreased balance with poor calf strength, and decreased upper extremity strength.  (Tr. at 205).

As previously stated, Wicker participated in vocational rehabilitation to learn computer skills and typing.  (Tr. at 288).  At the hearing, she testified she was doing "pretty good," but did not know her typing speed.  (Tr. at 289).   The VE stated that further information from Division of Rehabilitative Services regarding Wicker's work samples would be important, "[p]articularly if [vocational rehabilitation is] going to have her do some typing."  (Tr. at 328).  The ALJ's conclusion that Wicker retains the RFC to perform sedentary work relies on Wicker's ability to learn and perform office skills such as typing.

The record contains two letters from Jacqueline Harder, Wicker's rehabilitation counselor at Southeast Human Service Center.  (Tr. at 120, 255).  The first letter, written to Wicker's attorney in December 2004, states that Wicker had completed a data entry course and was taking other computer classes.  (Tr. 120).  Harder states:  "Progress is slow in the computer/keyboarding area.  She is not proficient with her typing skills.  She would not be able to be competitively employed in an occupation that involves typing or keying on a regular basis. . ."  (Tr. at 120).  She concludes by stating that Wicker will continue to work with

vocational rehabilitation on skill building. (Tr. at 120). Following the ALJ's unfavorable decision, Harder wrote a letter to the Appeals Council. (Tr. at 255). Harder describes Wicker's progress with the vocational rehabilitation program:

> [Vocational Rehabilitation] . . . assisted Vicky in some basic computer courses that were self paced. She was only able to attend classes for 1 ½ hours at a time before needing to go home and rest due to fatigue. It took her many hours to finish the coursework that she was assigned. Vicky would need to take the work home and work on it after her rest in order to complete the work.
>
> The employment areas of reception work and entry level information clerks in the area are also asking for computer knowledge as well as wanting proficient computer skills. With the minimum typing speed that Vicky has acquired, she will not be able to keep up with the standards of the office setting. Her average speed was 20-25 wpm when she was attending class and practicing on her own time at home. [Vocational Rehabilitation] is not progressing with any further computer courses at this time.

(Tr. at 255). In light of these comments, the record as a whole simply does not support the Commissioner's conclusion that Wicker retains the RFC for full-time employment as a receptionist, scheduling clerk, or similar occupation. See McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (stating claimant's RFC "is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.")

Based on the flawed RFC, the magistrate judge concludes the Commissioner failed in her burden to establish there are jobs in the regional and national economy that Wicker can perform. In fact, substantial evidence to the contrary exists and demonstrates Wicker is not capable of performing the jobs that the ALJ ultimately concluded she could perform. Therefore, the court recommends the Commissioner's decision be remanded under Sentence Four for hearing to determine whether Wicker's RFC from the period of October 20, 2003 to May 5, 2005 would allow her to realistically perform jobs available in the national economy. See Warner v. Heckler,

722 F.2d 428, 431 (8th Cir. 1983).

## *Conclusion*

For the foregoing reasons, **IT IS RECOMMENDED:**

1. Plaintiff's motion for remand under Sentence Four be **GRANTED** (Doc. #9) with directions for rehearing to determine whether Wicker was disabled from October 20, 2003 to May 5, 2005.

2. Plaintiff's motion for summary judgment be **DENIED** (Doc. #5).

3. Defendants's motion for summary judgment be **DENIED** (Doc. #7).

Pursuant to Local Rule 72.1(E)(4), any party may object to this recommendation within ten (10) days after being served with a copy.

Dated this 14th day of February, 2007.

/s/ *Karen K. Klein*
Karen K. Klein
United States Magistrate Judge